United States District Court
Southern District of Texas
**ENTERED**
April 21, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

§
PENGU SWIM SCHOOL, LLC, *et al.*,  §
§
*Plaintiffs*,  §
§
vs.  §  Case No. 4:21-CV-1525
§
BLUE LEGEND, LLC, *et al.*,  §
§
*Defendants*.  §

**MEMORANDUM AND ORDER ON
CROSS MOTIONS FOR SUMMARY JUDGMENT**[1]

This is a trade dress infringement case.[2] The parties are competing swimming

schools offering swim lessons to children in the Greater Houston area.[3] In this action,

Pengu alleges that Blue Legend copied Pengu's swimming school's distinctive trade

dress designs and used them on its swim schools, creating a likelihood of consumer

confusion between Pengu and Blue Legend. The parties filed cross-motions for

---

[1] On August 19, 2021, based on the parties' consent, the case was transferred to this Court to conduct all proceedings pursuant to 28 U.S.C. § 636(c). Consent & Transfer Order, ECF No. 14.

[2] Trade dress is one type of trademark. *Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 209-10 (2000). "A trademark is a distinctive mark, symbol, or emblem used by a producer or manufacturer to identify and distinguish his goods from those of others." *HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 872 F. Supp. 2d 1154, 1174 (D. Colo. 2012) (quotation marks omitted). The Lanham Act provides a right of action for trade dress infringement. 15 U.S.C. § 1125(a).

[3] Plaintiffs are Pengu Swim School, Pengu Swim School Riverstone, LLC, Pengu Swim School Cinco Ranch, LLC, and Pengu Swim School Towne Lake, LLC (collectively, "Plaintiffs" or "Pengu"). Defendants are Blue Legend, LLC, and Blue Legend Katy, LLC (collectively, "Defendants" or "Blue Legend").

summary judgment.[4]

To recover on their trade dress infringement claim, Plaintiffs must show that their trade dress is protectable and Defendants have infringed it. To be protectable in this case, Plaintiffs must show that their trade dress was either inherently distinctive or distinctive through acquired secondary meaning. In addition, they have to show that their trade dress was nonfunctional. Based on a thorough review of the briefing, record, and applicable law, the Court finds that Plaintiffs have failed to establish that their trade dress is inherently distinctive, and summary judgment against Plaintiffs is granted on this issue. The Court additionally finds that Plaintiffs have established that their trade dress is nonfunctional and summary judgment in favor of Plaintiffs is granted on this issue. However, a genuine question of fact exists as to whether their trade dress has acquired secondary meaning, and whether Defendants have infringed on their trade dress. Therefore, because there are material issues of fact in dispute, this case will proceed to trial.

## I.    BACKGROUND FACTS

In 2013, Pengu swim schools opened for business in the Houston area. L. Hofbauer Aff. ¶ 7, ECF No. 1-1 at 2. Pengu's owner, Lothar Hofbauer, contends that the ideas for the swim school design stemmed from his visit to South Africa in

---

[4] Pls.' MSJ, ECF No. 57; Defs.' MSJ, ECF No. 59. Each side filed a response, Pls.' Resp., ECF No. 69; Defs.' Resp., ECF No. 70, and a reply, Pls.' Reply, ECF No. 75; Defs.' Reply, ECF No. 73. Plaintiffs also filed a motion to strike Defendants' reply. Pls.' Mot. Strike, ECF No. 76.

1994, where he was enthralled with colorful Victorian-style changing houses lining Muizenberg Beach. *Id*. ¶ 4. According to Plaintiffs, the changing houses were painted bright red, blue, green, and yellow and had A-frame roofs. ECF No. 57 at 6-7. The colors varied across changing houses, each with altering colors for walls, door trim, and roof trim. *Id*. at 7. When the Hofbauers decided to build their swim schools, the changing houses in South Africa inspired their design choices. L. Hofbauer Aff. ¶¶ 4-5, ECF No. 1-1 at 2. Plaintiffs contend that their trade dress includes these design elements and colors, creating an overall feel reminiscent of the South African beach. ECF No. 57 at 21. According to Plaintiffs, each of their swim schools use common "visual elements" that contribute to their "total image and overall appearance." ECF No. 57 at 19, 23; *see also* ECF No. 1 at ¶ 2.

In 2020, Blue Legend opened two swim schools—one in Katy, Texas, and one in Sugarland, Texas. ECF No. 59 at 6. Plaintiffs assert that Defendants used Pengu's total image and overall appearance in the Blue Legend swim schools, infringing on Plaintiffs' trade dress. ECF No. 57 at 16, 18-34. Plaintiffs seek summary judgment, asserting there is no genuine issue of material fact that their trade dress is protectable, and Defendants' use of their trade dress is infringing because it is likely to cause confusion. *Id*. at 19-34. To the contrary, Defendants contend Plaintiffs have not presented evidence showing their trade dress is protectable and Blue Legend is entitled to summary judgment in its favor. ECF

No. 59 at 21-34; ECF No. 70 at 6-30.

## II.    THE SUMMARY JUDGMENT STANDARD.

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. FED. R. CIV. P. 56(a). A fact is "material" if its resolution "might affect the outcome of the suit under the governing law." *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Disputes about material facts are "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Brackeen v. Haaland*, 994 F.3d 249, 290 (5th Cir. 2021) (quoting *Anderson*, 477 U.S. at 248)).

The movant carries the initial burden "to identify areas in which there is an absence of a genuine issue of material fact." *Recif Res., LLC v. Juniper Cap. Advisors, L.P.*, No. CV-H-19-2953, 2020 WL 5739138, at *3 (S.D. Tex. Sept. 24, 2020) (quoting *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 839 (5th Cir. 2012)). However, the movant "need not negate the elements of the nonmovant's case." *Magema Tech. LLC v. Phillips 66, Phillips 66 Co.*, No. CV-H-20-2444, 2023 WL 320180, at *19 (S.D. Tex. Jan. 19, 2023) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). If the movant meets its burden, the non-movant must "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial." *Nola Spice Design, L.L.C. v.*

*Haydel Enters., Inc*., 783 F.3d 527, 536 (5th Cir. 2015) (cleaned up).

In reviewing the evidence, the Court may "not make credibility determinations or weigh the evidence." *Wells v. Minn. Life Ins. Co*., 885 F.3d 885, 889 (5th Cir. 2018) (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000)). When, as here, parties file cross-motions for summary judgment, "[courts] review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *DynaEnergetics Eur. GmbH v. Hunting Titan, Inc.*, No. CV-H-20-2123, 2022 WL 4350264, at *7 (S.D. Tex. Sept. 19, 2022) (quoting *Cooley v. Hous. Auth. of the City of Slidell*, 747 F.3d 295, 298 (5th Cir. 2014)). However, "[i]f the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim." *Magema*, 2023 WL 320180, at *20 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists." *Id*. (citing *Celotex*, 477 U.S. at 324). Thus, at this point, "[t]he nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Springboards to Educ., Inc. v. Hous. Indep. Sch. Dist*., 285 F. Supp. 3d 989, 992 (S.D. Tex. 2018), *aff'd on other grounds*, 912 F.3d 805 (5th Cir. 2019), *as*

*revised* (Jan. 29, 2019), *as revised* (Feb. 14, 2019) (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)).

"Furthermore, it is not the function of the court to search the record on the nonmovant's behalf for evidence which may raise a fact issue." *Springboards*, 285 F. Supp. 3d 989 at 992 (quoting *Topalian v. Ehrman*, 954 F.2d 1125, 1137 n.30 (5th Cir. 1992)). Therefore, "the nonmoving party . . . must respond by setting forth specific facts indicating a genuine issue for trial." *Id.* at 992 (quoting *Goodson v. City of Corpus Christi*, 202 F.3d 730, 735 (5th Cir. 2000)). The nonmoving party must also respond by "articulat[ing] the precise manner in which that evidence supports his or her claim." *Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 176 (5th Cir. 2016) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)). The nonmoving party's failure "to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Luxottica Grp., S.P.A. v. Ochoa's Flea Mkt., LLC*, No. 7:20-CV-00061, 2022 WL 836823, at *9 (S.D. Tex. Mar. 21, 2022) (quoting *Adams v. Travelers Indem. Co. of Conn.,* 465 F.3d 156, 164 (5th Cir. 2006)).

## III.   LAW & ANALYSIS

Plaintiffs move for summary judgment contending that their trade dress is protectable and Defendants' copying of it creates a likelihood of confusion between

Pengu and Blue Legend. ECF No. 57 at 18-34. Defendants move for summary judgment asserting that Plaintiffs' trade dress is not protectable and warrants summary judgment in its favor. ECF No. 59 at 17, 22-34.[5] The Court addresses each of these issues in turn.

### A. Trade Dress Under The Lanham Act.

Section 43(a) of the Lanham Act provides a private cause of action for violations of protected trademark rights. 15 U.S.C. § 1125(a)(1)(A). This protection is not limited to registered trademarks but applies to trade dress and is analogous to the common law tort of unfair competition. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 250-51 (5th Cir. 2010).

"Trade dress refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." *Id.* at 251 (citations omitted); *see also CAP Barbell, Inc. v. HulkFit Prod., Inc*., No. CV H-22-2371, 2023 WL 2247057, at *6 (S.D. Tex. Feb. 27, 2023) (quoting the same). Trade dress also includes the "motif" of a restaurant. *Sparrow Barns & Events, LLC v. Ruth*

---

[5] Defendants also move for summary judgment on Plaintiffs' common law claims for unjust enrichment, trade dress infringement, and unfair competition. ECF No. 59 at 5, 19-20, 34. Because the same standards apply to federal and state law trademark infringement and unfair competition claims, the Court's analysis of the protectability of Plaintiffs' trade dress under the Lanham Act applies to Plaintiffs' trade dress claims under state law for infringement and unfair competition. *See YETI Coolers, LLC v. Home Depot U.S.A., Inc*., No. 1:17-CV-342, 2018 WL 1277753, at *2 n.1 (W.D. Tex. Mar. 12, 2018) (citing *Amazing Spaces*, 608 F.3d at 236 n.7).

*Farm Inc.*, No. 4:19-CV-00067, 2019 WL 1560442, at *4 (E.D. Tex. Apr. 10, 2019) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 (1992)). The purpose of trade dress protection is to "secure to the owner of the trade dress the goodwill of [its'] business and to protect the ability of consumers to distinguish among competing products." *Amazing Spaces*, 608 F.3d at 251 (quoting *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002)).[6]

Trade dress protection extends to both registered and unregistered trade dress. *AMID, Inc. v. Medic Alert Found. U.S., Inc.*, 241 F. Supp. 3d 788, 800-01 (S.D. Tex. 2017). A party can register its trade dress with the United States Patent and Trademark Office ("PTO"). Registration provides the owner with protection because it is entitled to a presumption that the mark is valid. *Id.* In contrast, to prevail on an unregistered trade dress infringement claim, plaintiffs must prove that: "(1) [their] trade dress qualifies for protection; and (2) the trade dress has been infringed by demonstrating a likelihood of confusion in the minds of potential consumers." *Beatriz Ball, L.L.C. v. Barbagallo Co., L.L.C.*, 40 F.4th 308, 316–17 (5th Cir. 2022)

---

[6] However, "trade dress protection extends only to incidental, arbitrary or ornamental product features which identify the source of the product." *Laney Chiropractic & Sports Therapy, P.A. v. Nationwide Mut. Ins. Co.*, 866 F.3d 254, 261 (5th Cir. 2017) (quoting *Eppendorf*, 289 F.3d at 355). And "[u]nless protected by patent or copyright, functional product features may be copied freely by competitors in the marketplace." *Eppendorf*, 289 F.3d at 355; *accord CAP Barbell*, 2023 WL 2247057, at *6 ("If a product feature is functional, it cannot be protected trade dress.") (quoting *Eppendorf*, 289 F.3d at 355). Thus, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods or products." *CAP Barbell*, 2023 WL 2247057, at *6 (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001)).

(citing *Amazing Spaces*, 608 F.3d at 236). Unregistered trade dress qualifies for protection when a plaintiff establishes the trade dress is both: (1) distinctive, either by showing the trade dress is inherently distinctive or has acquired secondary meaning; and (2) is nonfunctional. *AMID*, 241 F. Supp. 3d at 800-01 (citing *Wal-Mart*, 529 U.S. at 210–11; *Two Pesos*, 505 U.S. 763, 769-70).

Thus, the court must determine whether the trade dress is protectable because it is distinctive, either inherently or through acquired secondary meaning. Then, the court must consider whether the trade dress is functional. Finally, the Court must consider whether the trade dress was infringed. The Court discusses each of these elements in turn.

### 1. Inherently distinctive: the elements of Plaintiffs' trade dress.

To determine whether the trade dress is inherently distinctive, the court must first determine which elements comprise Plaintiffs' trade dress. *Id.* at 804. Plaintiffs defined their trade dress in their complaint as follows:

> (1) red, blue, green, and yellow colored dressing rooms; (2) individual dressing rooms situated adjacent to one another in a row; (3) alternating red, blue, green, and yellow colored dressing room doors, door trim, and roof trim; (4) structural dressing room elements including A-frame roof style, shiplap siding, and ventilated doors; (5) decorative design surrounding the swimming pool comprising several shades of blue arranged to resemble waves; (6) swim lane dividers comprising alternating blue and red colored segments; (7) beach sand floor color and surface throughout the lobby and pool area; and (8) design, shape, and configuration of the swim school building interior and exterior.

ECF No.1 at ¶ 28.

Defendants challenge Plaintiffs trade dress on several grounds. Defendants assert that Plaintiffs' "open-ended" list of trade dress elements and the eighth element defined as the "design, shape, and configuration of the swim school building interior and exterior" are vague and indefinite.[7] ECF No. 59 at 21. Further, Defendants argue that Plaintiffs have inconsistently defined their trade dress, failing to give adequate notice of what is protected. *Id*. at 21; ECF No. 70 at 8. Plaintiffs contend that they have appropriately identified their trade dress providing Blue Legend fair notice of their claims. ECF No. 69 at 13.

A plaintiff has the burden of identifying its claimed trade dress and is required to articulate the specific elements which comprise its trade dress. *AMID*, 241 F. Supp. 3d at 807 (citing *Forney Indus., Inc. v. Daco of Mo., Inc*., 835 F.3d 1238, 1252 (10th Cir. 2016)). A plaintiff meets its burden when it articulates the specific elements of its trade dress in a manner that "give[s] notice of what is claimed to competitors." *YETI Coolers, LLC v. Imagen Brands*, LLC, No. 1:16-CV-00578, 2017 WL 2199012, at *4 (W.D. Tex. May 18, 2017). A plaintiff fails to meet its

---

[7] Without any further specification or elaboration, Defendants also assert that "many of the listed elements [of Plaintiffs' trade dress] are identified in general terms." ECF No. 59 at 21. Accordingly, the argument that any elements, other than the eighth element, are defined in general terms is waived for inadequate briefing. *See O'Brien v. Methodist Hosp*., No. 4:20-CV-4084, 2022 WL 18864879, at *9 (S.D. Tex. Dec. 23, 2022), *report and recommendation adopted*, 2023 WL 2249985 (S.D. Tex. Feb. 24, 2023) (citing *Magee v. Life Ins. Co. of N. Am*., 261 F. Supp. 2d 738, 748 n.10 (S.D. Tex. 2003)).

burden when an element does not appear in its photographs or it does not provide a description of "the design, appearance, or placement" of the contents of the element. *Id*. When an element does not contain these necessary details, a court may exclude the vague element from the plaintiff's trade dress definition. *Clearline Techs. Ltd. v. Cooper B-Line, NC.*, No. CV-H-11-1420, 2012 WL 12893491, at *5 (S.D. Tex. July 2, 2012) (excluding "vague references" to "shape, dimensions, [and] color scheme" from the plaintiff's trade dress definition).

Here, contrary to Defendants' assertion, Plaintiffs consistently define their trade dress. *See* Pls.' Compl, ECF No.1 at ¶ 28; L. Hofbauer Aff. ¶ 6, ECF No. 1-1 at 2; Pls.' MSJ, ECF No. 57 at 8. However, as Defendant correctly identified, two components of Plaintiffs' trade dress definition are vague. First, the beginning of Plaintiffs' trade dress definition in their complaint reads "Pengu's trade dress includes, but is not limited to," and then lists eight elements. *See* ECF No.1 at ¶ 28. The phrase "includes but is not limited to" fails to provide competitors with notice because the language is open ended and fails to provide a complete description of "the design, appearance, or placement" of what is claimed. *See YETI Coolers*, 2017 WL 2199012, at *4. Therefore, because it is vague, the Court excludes the phrase "includes but is not limited to" from Plaintiffs' definition of their trade dress. *Cf. Clearline*, 2012 WL 12893491, at *5.

Second, Plaintiffs' eighth element is defined as "design, shape, and

configuration of the swim school building interior and exterior." ECF No.1 at ¶ 28; L. Hofbauer Aff. ¶ 6, ECF No. 1-1 at 2; ECF No. 57 at 8. In their complaint, Plaintiffs fail to include either a photograph or description of the design, appearance, or placement of the building. Additionally, as Defendants showed, Pengu's owner, Tiffany Hofbauer, was unable to define the eighth element during her deposition. *See* T. Hofbauer Dep. 130-52, ECF No. 60-1 at 33-38. Plaintiffs failed to dispute this evidence. ECF No. 69 at 13-15. Therefore, because the eighth element is too vague to provide competitors with notice of what Plaintiffs claim is part of their trade dress definition, the Court excludes it. *Cf. Clearline Techs. Ltd*, 2012 WL 12893491, at *5.

Accordingly, Plaintiffs' trade dress is comprised of the following elements: (1) red, blue, green, and yellow colored dressing rooms; (2) individual dressing rooms situated adjacent to one another in a row; (3) alternating red, blue, green, and yellow colored dressing room doors, door trim, and roof trim; (4) structural dressing room elements including A-frame roof style, shiplap siding, and ventilated doors; (5) decorative design surrounding the swimming pool comprising several shades of blue arranged to resemble waves; (6) swim lane dividers comprising alternating blue and red colored segments; and (7) beach sand floor color and surface throughout the lobby and pool area. ECF No.1 at ¶ 28; L. Hofbauer Aff. ¶ 6, ECF No. 1-1 at 2; ECF No. 57 at 8.

### 2. Plaintiffs' trade dress fails to qualify as inherently distinctive.

Plaintiffs argue that their trade dress is inherently distinctive because "the combination of visual elements creates a unique, distinctive commercial impression" under both the controlling *Abercrombie* test and *Seabrook* test. ECF Nos. 57 at 19-22, 69 at 21-24. Defendants contend that Plaintiffs' trade dress is not inherently distinctive. First, Defendants contend that the *Abercrombie* test is inapplicable. Second, they argue that Pengu failed to meet the *Seabrook* test. ECF Nos. 59 at 20-34, 70 at 8-15, 73 at 9-13.

The Court will consider whether the *Abercrombie* test or *Seabrook* test applies.

### a. *The Abercrombie test does not apply because it is limited to word marks.*

The *Abercrombie* test is a framework developed for determining whether *word* marks are inherently distinctive. *See AMID*, 241 F. Supp. 3d at 802 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)). The categories described in *Abercrombie* classify marks in a spectrum from lesser to increasing distinctiveness, as follows: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Id.* (citing *Abercrombie*, 537 F.2d at 9-11 & n.12). A mark's "placement on this spectrum determines whether and how it is entitled to legal protection." *Amazing Spaces*, 608 F.3d at 241. The generic classification refers to the basic nature of articles or services rather than individualized characteristics of

a particular product and is unprotectable as a trademark. *Id.* Suggestive, arbitrary, and fanciful serve to identify a particular source of a product and are deemed inherently distinctive entitled to protection. *Id.* (citing *Two Pesos*, 505 U.S. at 768). A mark "lacks inherent distinctiveness if its intrinsic nature does not serve to identify its source." *Id.* at 242 (citing *Wal–Mart Stores*, 529 U.S. at 210).

This test has recently been limited to the context of marks consisting of words. *Amazing Spaces*, 608 F.3d at 240 (citing *Wal–Mart Stores*, 529 U.S. at 210). Nonetheless, Plaintiffs attempt to fit their trade dress into the *Abercrombie* framework. ECF No. 69 at 22. According to Plaintiffs, because their claimed trade dress is not generic, descriptive, or suggestive of their swim school services, the trade dress is either arbitrary or fanciful, and thus inherently distinctive. *See id*. Defendants argue that the *Abercrombie* test is inapplicable to trade dress. ECF No. 73 at 11.

The court agrees with Defendants. Here, Plaintiffs' trade dress does not consist of words, but the inside design of their swim school. Thus, the *Abercrombie* test does apply. *Amazing Spaces*, 608 F.3d at 240.

> **b.      *Plaintiffs' trade dress fails to qualify as inherently distinctive under the Seabrook test.***

The *Seabrook* test examines whether the claimed trade dress is a common basic shape or design, unique or unusual in a particular field, a mere refinement of a commonly-adopted and well-known form of ornamentation, or capable of creating

a distinct commercial impression. *Nola Spice Designs*, 783 F.3d at 540–41. "These factors . . . are 'variations on a theme'—namely 'whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin.'" *Amazing Spaces, Inc.*, 608 F.3d at 244. Thus, the question is whether "the [trade dress] at issue almost *automatically* tell[s] a customer that it refers to [the plaintiff's] brand." *Wal–Mart*, 529 U.S. at 212.

Here, under the *Seabrook* factors, Plaintiffs have not established that their trade dress is inherently distinctive. The evidence confirmed that the various elements of the alleged trade dress are often used together, albeit in slightly different combinations, in swim schools. *See In-N-Out Burgers v. Doll n' Burgers LLC*, No. 20-11911, 2022 WL 791924, at *20 (E.D. Mich. Mar. 14, 2022). For example, a competing swim school's application to PTO included a tropical theme, blue wave design, and swim lane dividers in its trade dress definition. ECF No. 59-10 at 1.[8]

---

[8] Goldfish Swim School Franchising, LLC's description of its trade dress in its application to the USPTO included the following: "The mark consists of Three-dimensional trade dress for the appearance of a brightly colored swim school having a tropical theme. The walls of the tropical themed swim school consist of a bright colored wave pattern that are shaded blue, light blue, and aqua blue. The floor of the swim school is sandy in appearance. The individual changing rooms and restrooms have slanted roofs made of corrugated metal, three-quarter louvered doors, and mirrors shaped like port holes. The fish tank also has a slanted roof and port holes. The hair dryer station features a large circular mirror, thatched roof, and surf board benches. The tropical themed swim school also contains nautical shaped lights; cubby holes; tropical decoration, including palm trees and cabanas with thatched roofing; and rowed seating. The swimming pool is heated and contains lane dividers. The showers feature a see-through glass wall and bench. The front desk is elbow shaped and contains goldfish cutouts. The wall behind the front desk is made of bamboo

Both of Pengu's owners testified that blue waves painted on the swim school walls was a common theme. T. Hofbauer Dep. 154:23-155:3, ECF No. 60-1 at 39; L. Hofbauer Dep. 63:6-12, 63:24-64:4, ECF No. 60-2 at 16. Defendants also produced evidence of various swim school websites showing that these colors are commonly used. ECF No. 59-5 at 2. Pengu's owner testified there is a limited choice of colors for swim lane dividers and other schools use the same blue and red colors as they use. L. Hofbauer Dep. 66:14-17, ECF No. 60-2 at 17. With regard to dressing rooms lined up in rows, Defendants submitted images of swim schools with adjacent dressing rooms lined up in rows. ECF No. 59-9 at 21. Additionally, Plaintiffs' owner admitted that too many swim schools to list have dressing rooms in rows. L. Hofbauer Dep. 73:8-14, ECF No. 60-2 at 19. Another competing swim school used A-frame roof lines. ECF No. 59-15 at 39.

On the other hand, Plaintiffs introduced images showing that other competing swim schools do not use the same combination of features that they use. *See* ECF No. 57 at 13 (comparing images of Pengu and Goldfish); *id.* at 14 (comparing images of Pengu and Dolphin Academy); *id.* at 15 (comparing images of Pengu, Nitro, and AquaTots). In highlighting the differences, Plaintiffs argues that "Goldfish uses pastel hues of a variety of non-primary colors in its huts" and Nitro's huts use shades of orange and blue, various siding patterns, various roof frame styles, and do not

---

and features the design of a goldfish." ECF No. 59-10 at 1.

include ventilated doors. *Id*.

However, "[e]ven if the court assumes the complete list of elements alleged in Plaintiff's complaint are present in such a combination only at [Plaintiffs' swim schools], that fact alone does not meet the standard." *In-N-Out Burgers*, 2022 WL 791924, at *20. The evidence must establish that the trade dress was unique or unusual for swim schools and not mere refinements of commonly adopted and well-known forms of ornamentation used in other swim schools. *See id*. Instead, Plaintiffs' evidence shows that, even if its elements in combination could be deemed unique, the elements of their trade dress are nothing more than refinements of commonly-adopted and well-known features used in other swim schools. *See id*. (finding the plaintiff's evidence did not establish that its trade dress was "unique or unusual for fast food eateries" when the evidence showed that "the overall color scheme and much of the interior were the prototypical features of a retro drive-thru burger restaurant.").

Accordingly, Plaintiffs have failed to present enough evidence that would allow a reasonable factfinder to conclude that its trade dress—made from elements and designs common in swim schools—are inherently distinctive. *See id*. Therefore, the Court grants summary judgment in favor of Defendants on the issue of inherent distinctiveness. *See id*.

### 3. A fact issue exists as to whether Plaintiffs' trade dress has acquired secondary meaning.

Even if trade dress is not inherently distinctive, it "acquires distinctiveness . . . if it has developed secondary meaning." *AMID*, 241 F. Supp. 3d at 808 (citing *Wal-Mart*, 529 U.S. at 211). Plaintiffs argue that their trade dress has acquired secondary meaning while Defendants argue that it has not. The Court will assess each of the factors the parties rely on to determine whether acquired secondary meaning is established as a matter of law.

"[S]econdary meaning . . . occurs when, in the minds of the public, the primary significance of a [trade dress] is to identify the source." *Wal-Mart*, 529 U.S. 205 at 211; *accord Beatriz Ball*, 40 F.4th at 317 (same). In examining the evidence, the Court's "focus is on how [the evidence] demonstrates that the meaning of the . . . trade dress has been altered in the minds of consumers." *Amazing Spaces*, 608 F.3d at 248. "The inquiry is one of the public's mental association between the [trade dress] and the alleged [trade dress] holder." *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir. 2008). Thus, "the determination [of] whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry." *Amazing Spaces*, 608 F.3d at 248.

"In the summary judgment context, [the defendants] may merely point to an absence of evidence of secondary meaning, thus shifting to [the plaintiffs] the burden of demonstrating by competent summary judgment proof that there is a genuine issue

of fact warranting trial." *Nola Spice Designs*, 783 F.3d at 543. The plaintiffs' "burden of demonstrating secondary meaning 'is substantial and requires a high degree of proof.'" *Id*. (quoting *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 567 (5th Cir. 2005)); *accord Beatriz Ball*, 40 F.4th at 317 (same). To determine whether a plaintiff has established that the claimed trade dress has acquired secondary meaning, the court examines the following seven factors: (1) length and manner of use of the trade dress; (2) volume of sales; (3) amount and manner of advertising; (4) nature of use of the trade dress in newspapers and magazines; (5) consumer survey evidence; (6) direct consumer testimony; and (7) the defendant's intent in copying the trade dress. *See Nola Spice Designs*, 783 F.3d at 544 (quoting *Amazing Spaces*, 608 F.3d at 248). "While none of these factors alone will prove secondary meaning, in combination they may establish the necessary link in the minds of consumers between a product and its source." *Id*. (cleaned up). The Court addresses each factor to weigh whether the evidence establishes acquired secondary meaning as a matter of law.

### a. *Plaintiffs' length and manner of use weigh in favor of secondary meaning.*

First, the Court examines the length and manner of Plaintiffs' use of the claimed trade dress. Plaintiffs produced evidence showing they have used the claimed trade dress since December 2013. L. Hofbauer Aff. ¶ 7, ECF No. 1-1 at 2; L. Hofbauer Decl. ¶ 5, ECF No. 57-17 at 6. Defendants contend that nine years is

insufficient to establish secondary meaning. ECF No. 73 at 15 (citing *Amazing Spaces*, 608 F.3d at 248).

In *Amazing Spaces*, the Fifth Circuit agreed with the district court's determination that Plaintiff's star symbol, which it had used for ten years, had not acquired secondary meaning.  608 F.3d at 249.  In *Nola Spice Designs*, the Fifth Circuit cited to *Amazing Spaces* and concluded that use of the marks at issue for a two year period was a relatively brief duration and alone did not raise a fact issue for trial on acquired secondary meaning. 783 F.3d at 544 (citing *Amazing Spaces*, 608 F.3d at 248). Even though the length of use in *Nola Spice Designs* was significantly shorter than the length in *Amazing Spaces*, the Fifth Circuit gave it some weight. *See id.*

Here, as in *Amazing Spaces* and *Nola Spice Designs*, the length of use is not long enough to be dispositive, but it provides some evidence of secondary meaning. *See id*.; *see also Unified Buddhist Church of Vietnam v. Unified Buddhist Church of Vietnam - Giao Hoi Phat Giao Viet Nam Thong Nhat*, No. CV-H-17-1433, 2019 WL 13252405, at *2 (S.D. Tex. July 1, 2019), *aff'd sub nom. Unified Buddhist Church of Vietnam v. Unified Buddhist Church of Vietnam*, 838 F. App'x 809 (5th Cir. 2020) (factor weighed in favor of finding secondary meaning when the mark had been in use for over thirty years). Thus, although nine years of use is not sufficient to be dispositive, it provides some evidence of secondary meaning.

Accordingly, the Court finds that the first factor weighs in favor of finding secondary meaning.

>    **b.    The lack of evidence of volume of sales weighs against secondary meaning.**

Second, the Court examines the volume of Plaintiffs' sales. However, Plaintiffs do not address this factor in their motion, raise any contentions in their complaint, or cite to any evidence concerning the volume of their sales. *See* ECF No. 57 at 22-24; ECF No. 69 at 24-26; ECF No. 75 at 6-7. Accordingly, this factor weighs against finding secondary meaning. *See Unified Buddhist*, 2019 WL 13252405, at *3 (finding the volume of sales weighed against finding secondary meaning when the plaintiff did not address the factor).

>    **c.    The amount and manner of Plaintiffs' advertising weighs in favor of secondary meaning.**

Third, the Court examines the amount and manner of Plaintiffs' advertising. For this factor, "spending substantial amounts of money does not of itself cause a mark or trade dress to acquire secondary meaning." *Nola Spice Designs*, 783 F.3d at 544 (cleaned up). "The relevant question is not the extent of the promotional efforts, but their effectiveness in altering the meaning of [the trade dress] to the consuming public." *Id*. at 545 (cleaned up). "[A]dvertisements may emphasize 'the source significance of the designation *through prominent use of the [mark or trade dress]*' and are therefore likely to alter the meaning of the mark or trade dress in the minds

of consumers." *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 541 (5th Cir. 1998), *abrogated on other grounds by TrafFix,* 532 U.S. at 32-33; *see Nola Spice Designs*, 783 F.3d at 545 (relying on *Pebble Beach* for its analysis of the advertising factor).

For this factor, Plaintiffs provide evidence that "[f]rom 2013 to the present, Pengu has invested approximately $879,621.67 in advertising and marketing the Pengu brand and design." L. Hofbauer Decl. ¶ 7, ECF No. 57-17 at 3. However, this evidence about how much Plaintiffs spent does not necessarily show that their advertising was effective "in altering the meaning of [the trade dress] to the consuming public." *Nola Spice Designs*, 783 F.3d at 545.

Accordingly, this factor weighs only slightly in favor of secondary meaning.

### d.   *The nature of the trade dress' use in media weighs slightly in favor of secondary meaning.*

Fourth, the Court examines the nature of Plaintiffs' claimed trade dress' use in the media. Under this factor, references to media without "evidence . . . of their impact on public perception" is "slim" evidence of secondary meaning. *Id.* at 546. Plaintiffs assert their "design elements, have been covered in articles by print and digital media outlets." ECF No. 69 at 25. In support, Plaintiff's owner testified that "Pengu advertises its services, using images of elements of its trade dress, on the internet and using social media. Press outlets in digital and print media have covered Pengu's schools, including its trade dress." L. Hofbauer Aff. ¶ 9, ECF No. 1-1 at 2.

With the exception of Pengu's own advertising, which is covered under the advertising factor, Plaintiffs provide no evidence of this media coverage to substantiate Hofbauer's conclusory statement. Moreover, even if this statement were not conclusory, Plaintiffs do not provide any evidence of how this media influenced the public's perception of its claimed trade dress. *See* ECF Nos. 57 at 22-24, 69 at 24-26, 75 at 6-7.

Accordingly, this factor weighs only slightly in favor of secondary meaning.

### e. *The lack of consumer survey evidence weighs against secondary meaning.*

Fifth, the Court examines whether there is consumer survey evidence. "[S]urvey evidence is the most direct and persuasive way of establishing secondary meaning." *Sno-Wizard*, 791 F.2d 423 at 427 (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc*., 698 F.2d 786, 795 (5th Cir. 1983)). The Fifth Circuit has "consistently expressed a preference for an objective survey of the public's perception of the mark at issue." *Amazing Spaces*, 608 F.3d at 248 (quoting *Vision Ctr. v. Opticks, Inc*., 596 F.2d 111, 119 (5th Cir. 1979)) (cleaned up). The "chief inquiry is the attitude of the consumer toward the mark" and whether the consumer discerns that the trade dress signifies a "single thing coming from a single source?" *Vision Ctr.*, 596 F.2d at 119 (cleaned up). Here, Plaintiffs do not address this factor. *See* ECF Nos. 57 at 22-24, 69 at 24-26, 75 at 6-7.

Accordingly, given the importance of this factor, it weighs against finding

secondary meaning. *See Unified Buddhist*, 2019 WL 13252405, at *3 (finding the fifth factor weighed against finding secondary meaning when the plaintiff did not address the factor).

> ### f. The lack of direct consumer testimony weighs against secondary meaning.

Sixth, the Court examines whether the Plaintiffs have provided any direct consumer testimony to support their secondary meaning contention. They have not. *See* ECF Nos. 57 at 22-24, 69 at 24-26, 75 at 6-7. Accordingly, the sixth factor weighs against finding secondary meaning. *See Unified Buddhist*, 2019 WL 13252405, at *3 (finding the sixth factor weighed against finding secondary meaning when the plaintiff did not address the factor, raise contentions, or cite to any evidence concerning direct consumer testimony).

> ### g. Defendants' intent to copy weighs in favor of secondary meaning.

Seventh, the Court examines whether there is evidence showing Defendants' intent to copy Plaintiffs' claimed trade dress. When evaluating the evidence for intentional copying, courts consider whether defendant intended to use the trade dress to derive benefits from plaintiff's reputation. *Beatriz Ball*, 40 F.4th at 319. Courts should "compare[] the total integration of features comprising the . . . trade dress," not "isolated features." *Id*. "Moreover, evidence of deliberate copying can be a weighty factor if it appears the cop[ier] attempted to benefit from the perceived

secondary meaning." *Id*.

Here, Plaintiffs point to circumstantial evidence that Defendants copied features of Plaintiffs' trade dress and other features of Plaintiffs' swim schools.[9] Specifically, Plaintiffs show the following from Blue Legend: (1) Blue Legend's business plan contained photographs of Pengu's changing rooms, pool area, and logo;[10] (2) an email between consultant Cindy Keefe and one of Blue Legend's architects C.C. Lee, stating "[w]hen I spoke with someone last week I thought they mentioned the Pengu school in Cinco Ranch as a concept they would follow;"[11] (3) an email between one of Blue Legend's owners, Shuo Yang ("Michael Yang"), and one of Blue Legend's designers, Ed Dumont, attaching fifteen photographs of Pengu;[12] (4) an email between Blue Legend's owner, Michael Yang, and another Blue Legend designer, Ermal Shpata, stating "I sen[t] to Ed [Dumont, designer] before the photo I like (Pengu Swim School) but I think we cannot copy their color combination and you should provide us our color scheme in order to represent the swim school;"[13] (5) an email that appears to be between Blue Legend's realtor Ted Cai and its contractor Will Bowerman, copying Blue Legend's owner Michael Yang,

---

[9] *See* ECF No. 57 at 9-11 (citing ECF Nos. 58-1 at 20-21; 58-2 at 2; 58-3 at 2-16; 58-4 at 2; 58-5 at 2; 58-6 at 2; 58-8 at 2; 58-9 at 2; 58-10 at 3; 58-11 at 4; 58-12 at 2).

[10] ECF No. 58-1 at 20-21.

[11] ECF No. 58-2 at 2.

[12] ECF No. 58-3 at 2-16.

[13] ECF No. 58-4 at 2.

entitled "Katy Swim School Floor Finish," attaching three photographs of Pengu's pool area;[14] (6) an mail  between realtor Mr. Cai and contractor Mr. Bowerman, copying Blue Legend's owner Michael Yang, discussing the type of lights Pengu uses in the pool area, and stating "[m]aybe we can consider something similar;"[15] (7) an email between realtor Mr. Cai and contractor Mr. Bowerman, copying Blue Legend's owner Michael Yang, including a photo of lights and changing room that appears to be from Pengu;[16] (8) an email between designer Mr. Dumont and sub-contractor Stanley Gines, stating "[t]he bench is painted wood in a profile resembling a surf board. It will be attached to the floor via 3 pipe legs similar to the one at Pengu;"[17] (9) an email between Blue Legend's owner Michael Yang, realtor Mr. Cai, and designer Mr. Dumont, stating "my point is that we probably could save some time by taking reference from other franchises such as Pengu, Goldfish[,] and Aqua Tots;"[18] (10) Blue Legend meeting notes, stating "BL suggested STOA [Blue Legend's architects] to do the case study of two PENGU Swimming School[s] located in Katy and Riverstone;"[19] and (11) an email between the employees of Blue Legend's architects stating, "double check-will see you all 10AM tomorrow at

---

[14] ECF No. 58-5 at 2-5.

[15] ECF No. 58-6 at 2.

[16] ECF No. 58-8 at 2.

[17] ECF No. 58-9 at 2.

[18] ECF No. 58-10 at 3.

[19] ECF No. 58-11 at 4.

Pengu."[20]

In response, Defendants deny they copied the Plaintiffs' trade dress, or that they intended to pass off their swim schools as the Plaintiffs'. Yang Decl. ¶ 34, ECF No. 70-14 at 7. Defendants also argue that Plaintiffs have not presented evidence that Defendants either copied or intended to copy their alleged trade dress. ECF No. 73 at 17. However, "[w]hen two product designs are so very similar, an inference of intent is permissible." *Beatriz Ball*, 40 F.4th at 319. Here, any reasonable jury could find that Plaintiffs' and Defendants' overall appearance of their swim lanes, wave designs, flooring, and changing room features and colors are very similar, allowing an inference of intent. *Compare* ECF No. 57 at 12 (photographs of Pengu), *with id.* (photographs of Blue Legend).

Therefore, the Court finds Plaintiffs presented enough evidence to support an inference of Defendants' intent to copy Plaintiffs' trade dress. *See Beatriz Ball*, 40 F.4th at 319. Accordingly, the seventh factor weighs in favor of finding secondary meaning. *See id*.

Overall, the length of Plaintiffs' use of its claimed trade dress—the first factor—and Defendants intentional copying of Plaintiffs' trade dress—the seventh factor—weigh in favor of secondary meaning; the amount and manner of Plaintiffs' advertising—the third factor—and its use in media—the fourth factor—weighs

---

[20] ECF No. 58-12 at 2.

slightly in favor of secondary meaning; and the remaining factors—the volume of sales, direct consumer testimony, and consumer survey evidence—weigh against secondary meaning. On balance, the Court finds that the length of use and intentional copying evidence are sufficiently weighty to create an issue of material fact as to whether the trade dress acquired secondary meaning. *Cf. Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc*., 765 F. Supp. 2d 884, 899 (S.D. Tex. 2011) ("Considering all of the factors relevant to secondary meaning, the Court finds that factual issues remain.").[21]

### 4.  Plaintiffs' trade dress is nonfunctional as a matter of law.

Next, the Court must examine whether the evidence establishes that the trade dress is nonfunctional. *AMID*, 241 F. Supp. 3d at 800-01. Defendants argue that Plaintiffs cannot prove that the individual elements of their trade dress or the combination is nonfunctional. ECF No. 59 at 22-34. In support, Defendants provide evidence showing most of the individual elements of Plaintiffs' trade dress are functional. *Id*. at 22-33. Plaintiffs contend that the overall appearance of their trade dress is nonfunctional. ECF Nos. 57 at 24, 69 at 26. Specifically, Plaintiffs contend "there is nothing functional . . . about Pengu's unique look." ECF No. 69 at 26.

For unregistered trade dress, Plaintiffs have the burden of proving

---

[21] Because a genuine issue of fact exists as to acquired secondary meaning under the Lanham Act, a genuine issue of fact also exists as to the issues of trade dress infringement under Texas common law and unfair competition under Texas law. *See YETI Coolers*, 2018 WL 1277753, at *2 n.1.

nonfunctionality. *See TrafFix*, 532 U.S. at 29. "Evidence that a product design is purely 'ornamental, incidental, or arbitrary' can be evidence of an absence of functionality." *Leapers, Inc. v. SMTS, LLC*, 879 F.3d 731, 736 (6th Cir. 2018) (citing *TrafFix*, 532 U.S. at 30). Similarly, trade dress may be nonfunctional based on its plain appearance. *See Gen. Motors Corp. v. Lanard Toys, Inc*., 468 F.3d 405, 417 (6th Cir. 2006) (concluding that "the plain appearance of the vehicle shows that the elements which comprise its trade dress are inherently non-functional.").

To determine whether a plaintiff's product design trade dress is nonfunctional, the Supreme Court has recognized two tests that courts apply: the traditional test and the competitive necessity test. First, under the traditional test, a plaintiff must show that each element is not "essential to the use or purpose" and does not "affect[] the cost or quality" of the plaintiff's services. *TrafFix*, 532 U.S. at 30, 33 (applying the traditional test to a product design trade dress); *see also Eppendorf*, 289 F.3d at 355-56 (applying traditional test to a product design trade dress); *but see Taco Cabana*, 932 F.2d at 1119) (Fifth Circuit case that predates *TrafFix* and *Eppendorf*, did not apply the traditional test and instead determined whether the combination of the plaintiff's trade dress elements was "arbitrary"). If the plaintiff shows that the trade dress is nonfunctional under the traditional test, only then "it is proper to inquire into a 'significant non-reputation-related disadvantage'"—referred to as the "competitive necessity" test. *TrafFix*, 532 U.S. at 33. "[T]here is no need to consider the

'competitive necessity' test where a product feature is functional under the traditional definition." *Eppendorf*, 289 F.3d at 356.

Here, Plaintiffs provided various types of evidence to establish that its trade dress is nonfunctional. To show that its trade dress is not essential to the use or purpose of its services, Plaintiffs submitted the affidavit of its owner who said that "Pengu's trade dress does not serve a function other than its purpose as a decorative design." L. Hofbauer Aff. ¶ 8, ECF No. 1-1. "Pengu's trade dress is not essential to providing swimming instruction. *Id.* "The purpose and effect of Pengu's trade dress is to identify and distinguish Pengu's swim school services from those of its competitors." *Id.* In addition, Plaintiffs supported this affidavit with photos that depict images of other swim schools using various combinations of features similar to Plaintiffs trade dress. ECF No. 69 at 26 (citing ECF No. 57 at 13 (Figure 8), 14 (Figures 9-10), 15 (Figures 11-13), 16 (Figure 16)). To show that the trade dress does not affect the cost or quality of their services, Plaintiffs also rely on these photos. *Id*. (showing the interior designs across various swims schools are mainly differentiated by varying paint colors or "color schemes" and dressing room ornamentations and layouts). Plaintiffs assert this demonstrates that their trade dress is analogous to "the nonfunctional décor and motif of [the] Mexican-themed restaurant in *Taco Cabana*." ECF No. 75 at 7-8 (citing *Taco Cabana*, 932 F.2d at 1119).

Defendants contend Plaintiffs cannot prove their trade dress is nonfunctional and, in support, list various alleged trade dress elements it asserts are functional and the reason. For example, Defendants assert: dressing room colors attract children;[22] the dressing rooms in an arrangement of rows exists based on practicality;[23] industry commonly uses changing room doors, siding, and roofs;[24] shape and color limit the available choices for swim lane dividers;[25] and the sand-colored flooring forms a beach theme.[26]

Defendants' evidence is insufficient to create a fact issue on functionality when the "trade dress as a whole [was] primarily non-functional." *In-N-Out Burgers*, 2022 WL 791924, at *26. The elements they cite are clearly "more aesthetic in nature than functional." *Id.* For example, the record contains images of other swim schools' interior designs. ECF No. 69 at 26 (citing ECF No. 57 at 13 (Figure 8), 14 (Figures 9-10), 15 (Figures 11-13), 16 (Figure 16)). Contrary to Defendants assertions, these images show variety in the visual impressions swim schools create with assorted interior designs, including different dressing room arrangements, colors, and architectural features. *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113,

---

[22] Dep. T. Hofbauer 216:10-17, ECF No. 60-1 at 54.

[23] Dep. T. Hofbauer 184:12, ECF No. 60-1 at 46.

[24] ECF No. 59-5 at 5.

[25] Dep. L. Hofbauer 65:5-14, ECF No. 60-2 at 17.

[26] Dep. T. Hofbauer 202:5-9, ECF No. 60-1 at 51; 215:8-13, ECF No. 60-1 at 54.

1119 (5th Cir. 1991), *aff'd sub nom. Two Pesos*, *Inc. v. Taco Cabana, Inc*., 505 U.S.

763 (1992) ("Taco Cabana's particular integration of elements leaves a multitude of

alternatives to the upscale Mexican fast-food industry that would not prove

confusingly similar to Taco Cabana's trade dress."). This means that many swim

schools operate without the combination of red, blue, green, and yellow changing

rooms, A-frame style dressing room roofs, waves designs with several shades of

blue, and sand-colored floors that make up the trade dress at issue here. ECF No. 69

at 26 (citing ECF No. 57 at 13 (Figure 8), 14 (Figures 9-10), 15 (Figures 11-13), 16

(Figure 16)).

  This multitude of alternative combinations for swim schools' interior designs

also demonstrates that Plaintiffs' particular combination of trade dress elements is

arbitrary. *See Taco Cabana*, 932 F.2d at 1119 (defining an arbitrary combination of

individual trade dress elements as nonfunctional); *Pure Power Boot Camp, Inc. v.*

*Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 541 (S.D.N.Y. 2011)

(finding plaintiff's trade dress nonfunctional when it was possible to operate a fitness

facility without resembling the overall look and feel of the Pure Power facility).

Moreover, Defendants provide no contrary evidence showing the functionality of

the overall appearance of Plaintiffs' trade dress. *See* ECF Nos. 59 at 34, 70 at 19-21,

73 at 18-22. Thus, Plaintiffs' "particular arbitrary combination of functional

features, the combination of which is not itself functional, properly enjoys

protection." *Taco Cabana*, 932 F.2d at 1119.

After considering the evidence, the Court finds that no reasonable juror could find that the overall appearance of Plaintiffs' interior design trade dress is functional. *In-N-Out Burgers*, 2022 WL 791924, at *26; *Leapers*, 879 F.3d at 736; *Taco Cabana*, 932 F.2d at 1119. Even if each of Plaintiffs' individual trade dress elements are functional, as a matter of law, Plaintiffs' trade dress as a whole is primarily nonfunctional. *In-N-Out Burgers*, 2022 WL 791924, at *26 (concluding, "as a matter of law, that the alleged trade dress as a whole is primarily non-functional"); *Taco Cabana*, 932 F.2d at 1119 (same).

### 5.   There is a fact issue as to likelihood of confusion.

Once a plaintiff proves that the trade dress qualifies for protection—it is distinctive, either inherently or through acquired secondary meaning—and it is nonfunctional, the plaintiff must demonstrate a likelihood of confusion in the minds of potential consumers to show that the trade dress has been infringed. *Beatriz Ball*, 40 F.4th at 316–17. Plaintiffs argue that "application of the likelihood of confusion factors further demonstrates that Blue Legend's use of Pengu's trade dress to provide identical services creates a likelihood of confusion." ECF No. 57 at 26. Defendants contend that "there is a genuine dispute whether there is a likelihood of confusion." ECF No. 70 at 17. The Court will review the factors in assessing the likelihood of confusion.

In the Fifth Circuit, courts apply the following "digits of confusion" factors in assessing likelihood that Defendants' trade dress usage will confuse consumers: "the (1) similarity of the [plaintiff's and defendant's] products; (2) identity of retail outlets and purchasers; (3) identity of advertising media; (4) strength of the trade dress; (5) intent of the defendant; (6) similarity of design; (7) actual confusion; and (8) degree of care employed by consumers." *YETI Coolers, LLC v. Blueworks, LLC*, No. 1:20-CV-01159, 2021 WL 5828375, at *2 (W.D. Tex. Dec. 8, 2021), *report and recommendation adopted*, 2021 WL 8444875 (W.D. Tex. Dec. 28, 2021) (citations omitted). "Assessing the likelihood of confusion is 'typically a question of fact.'" *Icon Health & Fitness, Inc. v. Kelley*, No. 1:17-CV-356, 2017 WL 6610085, at *2 (W.D. Tex. Dec. 27, 2017), *report and recommendation adopted*, 2018 WL 1203465 (W.D. Tex. Jan. 11, 2018) (quoting *Xtreme Lashes, LLC v. Xtended Beauty, Inc*., 576 F.3d 221, 227 (5th Cir. 2009)). And "the absence or presence of any one factor ordinarily is not dispositive." *Id*. (quoting *Am. Rice, Inc. v. Producers Rice Mill, Inc*., 518 F.3d 321, 329 (5th Cir. 2008)).

Here, the application of the "digits of confusion" factors to the record reveals a genuine issue of fact as to "likelihood of confusion." The first three factors, similarity of services,[27] identity of retail outlets and purchasers,[28] and identity of

---

[27] "The more similar the products and services, the greater the likelihood of confusion." *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 193 (5th Cir. 2018).

[28] "The greater the overlap between retail outlets and purchasers, the greater the likelihood of

advertising media[29] are undisputed and favor Plaintiffs. *See* ECF No. 57 at 27-28; ECF No. 70 at 22-30. Plaintiffs and Defendants both offer swimming lessons, they have the same type of customers, and they advertise in similar ways. *See* ECF No. 57 at 27-28. The fourth factor, strength of trade dress,[30] implicates the issue of acquired secondary meaning and remains for the jury to decide.

The fifth factor, Defendants' intent, focuses "on whether the defendant intended to derive benefits from the reputation of the plaintiff." *Streamline*, 851 F.3d at 455. However, contrary to Plaintiffs' assertion, "mere awareness of the senior user's mark does not establish bad intent." *Id*. (cleaned up). "If there is no evidence of intent to confuse, then this factor is neutral." *Viacom*, 891 F.3d at 195. Here, Plaintiffs have shown sufficient evidence of Defendants' intent to copy that supports and inference of an intent to infringe but have not pointed to evidence showing that Defendants intended to confuse or to capitalize on Plaintiffs' reputation.[31] Thus,

---

confusion." *Id*. at 194.

[29] "The greater the similarity in the [advertising] campaigns, the greater the likelihood of confusion." *Id*. at 195 (cleaned up).

[30] "Generally, the stronger the [trade dress], the greater the likelihood that consumers will be confused by competing uses of the mark." *Smack Apparel*, 550 F.3d at 479. Strength in the marketplace is demonstrated by showing "strong established secondary meaning in the market." *Am. Rice*, 518 F.3d at 331.

[31] *See* ECF No. 57 at 28-30 (asserting use of senior user's mark by junior user is sufficient to establish bad intent); *see also* ECF No. 75 at 9 (asserting "Pengu has submitted overwhelming direct and circumstantial evidence demonstrating Blue Legend's intent to copy" that supports the "intent to infringe" without addressing whether there is evidence in the record showing Defendants' intent to capitalize on Pengu's reputation.).

factor five is neutral. *See Viacom*, 891 F.3d at 195.

Each party presented evidence in its favor for factors six through eight. For the sixth factor, similarity of design,[32] Plaintiffs provide evidence of similarities between Pengu's swim schools and Blue Legend's, and Defendants[33] provide evidence of differences.[34] For factor seven, actual confusion,[35] Plaintiffs present survey evidence showing a net consumer confusion rate of 46%;[36] and Defendants point to evidence showing several methodological flaws in Plaintiffs' survey design,

---

[32] "The more similar the marks, the greater the likelihood of confusion." *Streamline*, 851 F.3d at 454. "Even if two marks are distinguishable, we ask whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association." *Id.* (cleaned up).

[33] Also, for factor 6 (similarity of design), Defendants contend that "Plaintiffs fail to present evidence comparing the parties' overall trade dresses . . . [which] violate[s] the 'anti-dissection' rule." ECF No. 70 at 25 (citing *See Sun-Fun Prod., Inc. v. Suntan Rsch. & Dev. Inc.*, 656 F.2d 186, 189 (5th Cir. 1981)). However, Defendants argument as applied to Plaintiffs is unpersuasive because the authority Defendants cite applies the anti-dissection rule to the courts not the parties. *See Sun-Fun*, 656 F.2d at 189 ("[The Court's] analysis begins with the well-established proposition that similarity of design stems from the overall impression conveyed by the mark and not a dissection of individual features."); *see also New Century Fin., Inc. v. New Century Fin. Corp.*, No. C-04-437, 2005 WL 2453204, at *9 (S.D. Tex. Oct. 4, 2005) ("[i]t is easy to recite the rule that a court must compare the 'overall impression' created by the marks, but it is far more difficult to analyze mark similarity without focusing on specific, individual features and differences." But courts should not discount important similarities while only focusing on differences.). Accordingly, the Court considered both the similarities and differences in comparing Plaintiffs' trade dress with Blue Legend.

[34] *Compare* ECF No. 57 at 12 (showing photographs depicting the similarities between the dressing rooms and pool areas of Pengu's and Blue Legend's swim schools), *with* ECF No. 70 at 26-27 (discussing the differences between Pengu's and Blue Legend's swim schools (citing Yang Decl. ¶¶ 8-10, 12-33, ECF No. 70-14 at 3-7)).

[35] "To show actual confusion, a plaintiff may rely on . . . consumer surveys." *Viacom*, 891 F.3d at 197.

[36] ECF No. 57-14 at 36.

which may affect the weight of the survey as evidence.[37] Finally, for the eighth factor, degree of care,[38] Defendants point to some evidence showing that purchasers of swimming lessons exercised a heightened level of sophistication.[39] However, Plaintiffs assert "the potential purchasers of the parties' swim instructions are ordinary members of the general public" and thus have "no heightened level of sophistication." *See* ECF No. 57 at 33 (citing *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 707 (S.D. Tex. 2009)). None of these factors clearly weighs in favor of either side.

Thus, the evidence relating to the eight factors is conflicting and is not conclusive. Therefore, the Court denies Plaintiffs' motion for summary judgment on the issue of likelihood of confusion, and the issue remains for the jury to decide at trial.

## B. Defendant Is Entitled To Summary Judgment On Plaintiffs' Unjust Enrichment Claim.

"An action for unjust enrichment is based upon the equitable principle that a person receiving benefits which were unjust for him to retain ought to make restitution." *Streamline*, 851 F.3d at 461 (quoting *Bransom v. Standard Hardware,*

---

[37] Poret Decl. ¶¶ 2-4, 9, 15-52, ECF No. 70-15 at 1-32.

[38] "Confusion is more likely, if the products in question are impulse items or are inexpensive." *Savage Tavern, Inc. v. Signature Stag, LLC*, 589 F. Supp. 3d 624, 656 (N.D. Tex. 2022) (quoting *Sno-Wizard*, 791 F.2d at 428) (cleaned up).

[39] Yang Decl. ¶ 37, ECF No. 70-14 at 8.

*Inc.*, 874 S.W.2d 919, 927 (Tex. App.—Fort Worth 1994, writ denied)). "A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Id*. at 462 (quoting *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)).

Defendants assert that Plaintiffs have not presented evidence that would support a claim for unjust enrichment. ECF No. 59 at 34. Plaintiffs did not respond to this argument, showing evidence that created an issue of fact.[40] *See* ECF No. 69 at 28-29. Because Plaintiffs failed to raise an issue of material fact, Defendants' motion for summary judgment is granted as to unjust enrichment. *See Magema*, 2023 WL 320180, at *20 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

## IV.  PLAINTIFFS' MOTION TO STRIKE IS DENIED.

Plaintiffs move to strike Defendants two replies—one in support of their motion for summary judgment (ECF No. 73) and one in support of their motion to

---

[40] Instead, Plaintiffs incorrectly argue their unjust enrichment claim is unchallenged, citing to *Cathey Assocs., Inc. v. Beougher*, 95 F. Supp. 2d 643, 656 (N.D. Tex. 2000), which provides the standard for prevailing on an *unfair competition* claim. *See* ECF No. 69 at 28. Plaintiffs also cite to *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 585 (5th Cir. 1980), where the Fifth Circuit affirmed the district court's decision to order the defendant "to account to the plaintiffs for the profits it earned from its willful infringement," which the Fifth Circuit viewed as "serv[ing] two purposes: remedying unjust enrichment and deterring future infringement." *See* ECF No. 69 at 28. Further, Plaintiffs cite to *Taco Cabana*, 932 F.2d at 1121, for the proposition that a defendant "cannot escape accountability for unfair competition simply by pointing to particular elements it might have fairly employed." Missing is Plaintiffs' provision of evidence showing the requirement for an unjust enrichment claim, including that Defendants "obtained a benefit from [Plaintiffs] by fraud, duress, or the taking of an undue advantage[,]" has been met. *Streamline*, 851 F.3d at 462.

exclude the expert testimony of Rhonda Harper (ECF No. 74). ECF No. 76. According to Plaintiffs, the replies exceed the 10-page limit contained in Judge Keith Ellison's Court Procedures. ECF No. 76 at 3 (citing Judge Ellison's Court Procedures' Rule 7). Specifically, Plaintiffs assert that Defendants' 19-page reply in support of their motion for summary judgment and 18-page reply in support of their motion to exclude the expert are nearly double Judge Ellison's allotted page limit. *Id*.

Defendants respond that "[b]ecause the parties gave consent for a full referral to the magistrate judge, the governing procedures in this case are those set forth by Judge Palermo in the Procedures Manual, United States Magistrate Judge Dena Hanovice Palermo." ECF No. 79 at 3; *see also* Consent Order, ECF No. 14. Pursuant to Judge Palermo's Procedures Manual, the procedures in the Manual, "in addition to the Federal Rules of Civil Procedure, and the Local Rules of the Southern District of Texas, will govern all cases tried before United States Magistrate Dena Hanovice Palermo." *See* Judge Palermo's Procedures Manual, ECF No. 79-3 at 3. The only page limit specified in Judge Palermo's Procedures Manual is in Section IX-3, which provides that "[w]ithout leave of Court all memoranda of law are limited to 25 pages, 13-point type-font, double-spaced, with 1" margins." *Id*. at 11. And Local Rule 7.4 does not specify a page limit for replies.

Because the operative rules do not contain a page limit for reply briefs, the

Court denies Plaintiffs motion to strike the reply in support of Defendants' motion for summary judgment. Insofar as the Court has already ruled on the *Daubert* motions, Memorandum and Order, ECF No. 84, Plaintiff's motion to strike the reply in support of Defendants' motion to exclude Rhonda Harper, it is denied as moot.

## CONCLUSION

It is therefore **ORDERED** as follows:

The Court **GRANTS** Plaintiffs' motion for summary judgment, ECF No. 57, with respect to the nonfunctionality of their trade dress' overall appearance.

The Court also **GRANTS** Defendants' motion for summary judgment, ECF No. 59, with respect to the inherent distinctiveness of Plaintiffs' trade dress and Plaintiffs' unjust enrichment claim. Plaintiffs' unjust enrichment claim is **DISMISSED**.

In all other respects, the motions for summary judgment are **DENIED**.

Additionally, the Court **DENIES** Plaintiffs' motion to strike, ECF No. 76.

SIGNED at Houston, Texas, on April 21, 2023.

_____
**Dena Hanovice Palermo**
**United States Magistrate Judge**